UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| COVENTRY FIRST LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| 21st Services, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

COMES NOW plaintiff Coventry First LLC ("Coventry"), and for its complaint alleges as follows against defendant 21st Services. Allegations in this complaint concerning Coventry's own actions are based upon personal knowledge. All other allegations are based on information and belief.

1.     This is an action to redress harm Coventry has incurred as a result of 21st Services's misconduct in the market for "viatical settlements," a term defined at 40 Pa. Stat. § 626.2. Viatical settlements are a financial option for life insurance policyowners who no longer need the insurance coverage provided under their policy or no longer want to own an underperforming financial asset. Rather than surrender the policy to the life insurance carrier for the policy's cash value (if any), policyowners in certain circumstances are eligible to sell their policy to third-party "viatical settlement providers," which offer to purchase policies for their market value, which materially exceeds the cash surrender value. Pennsylvania law defines "viatical settlement" to include all secondary-market purchases of life insurance policies for compensation less than the policy's total death benefit, while industry participants and a number of states use the term "life settlements" to refer to that subset of settlement transactions that

involve insureds who are selling their policy for business or estate planning reasons, rather than to address an immediate cash need or to cover expenses associated with a terminal illness. For convenience, this complaint uses the term "settlements" to refer, as the context dictates, to all such transactions covered by the Viatical Settlements Act, 40 Pa. Stat. § 626.1 *et seq.*.

2.      The typical settlement transaction involves four primary participants: the policyowner, who is seeking to sell the insurance policy; the investor, who directly or indirectly provides the capital to purchase the policy (or an interest in the policy); the settlement provider, who effectuates the purchase and sale of the policy; and the underwriter, who provides a projection of life expectancy on which the purchase price of the policy is based. The value of a life insurance policy in a settlement is determined primarily based on the life expectancy of the insured. Where the insured's life expectancy is longer, the value of the policy in a settlement is lower; conversely, a shorter life expectancy generally increases the value of the policy to investors in the secondary market, because they expect to pay fewer premiums in the future and they expect to receive their return on investment sooner. Because life expectancy information is so central to the pricing of settlements, it is critical that all interested parties in a settlement have credible life expectancy information based on professional underwriting standards.

3.      21st Services has knowingly or with intent to defraud perpetrated a scheme to disseminate false material information concerning the life expectancy of insureds. As an underwriter, 21st Services's profits are based on the number of proposed settlements in which it is invited to submit life expectancy projections. 21st Services thus has a strong financial incentive to provide underwriting information that will maximize the number of settlement transactions in which its settlement provider clients are successful bidders. Moreover, in a series of sales meetings and other face-to-face conversations with Coventry executives, representatives

2

of 21st Services have admitted that 21st Services life expectancy projections are outside the normal range that would be expected based on professional standards.

4.       Like 21st Services, the profits of settlement providers are also transaction-based, in that the primary source of their compensation typically consists of fees generated at the time of purchase.  In other words, the more settlement transactions a settlement provider consummates, the higher its profit.  Because policyowners typically sell their policies to the settlement provider that submits the highest bid, settlement providers have a strong short-term financial incentive to use the underwriter that consistently provides the shortest life expectancy projections required to offer the highest bids.  21st Services has responded to the demand from such settlement providers, and has thereby attempted to increase its own profits, by supplying underwriting data that is attractive to unscrupulous or ignorant settlement providers who require a false underwriting basis to justify bids for life insurance policies that are not supported by the actual life expectancy of the insured.  While there is a range of reasonable life expectancy projections that professional underwriters might submit in any given case, it is clear that 21st Services's underwriting conduct is so consistently and significantly outside that range as to be not only unsupportable, but fraudulent.  As explained more fully below, an examination of detailed information concerning more than 1,600 proposed settlement transactions of which Coventry is directly aware reveals that 21st Services's mean life expectancy projections were lower than any other underwriter in 97 percent of cases, and that the average 21st Services life expectancy projection was shorter than the average life expectancy projection of all other participating underwriters by more than 50 percent.

5.       A respected, independent actuarial firm having no affiliation with Coventry has found 21st Services's life expectancy projections to be consistently and significantly understated.

3

In an August 2000 memorandum, an expert with Milliman & Robertson, Inc., a nationally recognized insurance actuarial firm, examined data from 21st Services's settlement underwriting activities and found that 21st Services inappropriately uses older mortality data that is an invalid predictor of actual life expectancy in the settlement context.  This memorandum stated that "[t]he risk of using older data is that the mortality ratios will be higher than present-day ratios, thus providing life expectancy estimates which are too short."

      6.      Unlike either underwriters or settlement providers, the financial interests of investors in the settlement market are not transaction-based.  Investors (on whom settlement providers entirely rely to provide the capital necessary to acquire insurance policies in the secondary market) seek to participate in pools of insurance policies that conform to certain underwriting criteria.  The value of investment interests in these pools depends on the accuracy of the life expectancy information on which policy acquisitions were based.  If an underwriter were to consistently and significantly overstate life expectancy projections, investors would receive a windfall when policies began to mature more quickly than expected.  But when underwriters consistently and significantly understate life expectancy projections, investors suffer enormous financial losses.  Investors thus expect that underwriters like 21st Services will adhere to professional underwriting standards to ensure that their life expectancy projections are accurate.

      7.      21st Services has preyed on investors' expectation of adherence to professional underwriting standards in numerous ways, including making misleading statements designed to persuade potential clients that their underwriting services are consistent with industry standards.  For example, in a February 2004 issue of the *Berlin Atlantic Capital AG Newsletter*, 21st Services held itself out as having "over 25 years of experience in assessing the possible risks and

quality of insurance policies – *specifically in respect to their marketability in the secondary market.*" (Emphasis added.)  And on their Internet site, 21st Services represents that their settlement underwriting services "provide a combination of Lloyd's of London approved life expectancies with a quick turnaround time that is without peer in the industry," even though Lloyd's of London has not approved their settlement underwriting practices, and the individual syndicate affiliated with Lloyd's that once did approve their practices has gone out of business following insolvency.

8.     21st Services's conduct as alleged herein has skewed the operation of the settlement market, disadvantaging companies (like Coventry) that establish their prices based on legitimate underwriting estimates of life expectancy, and advantaging other companies that establish prices based on falsely understated life expectancy projections.  21st Services's knowingly false statements injured Coventry by permitting certain of Coventry's competitors to acquire valuable life insurance policies in cases where Coventry would have been the successful bidder but for 21st Services's false statements regarding life expectancy, and by harming Coventry's reputation in the marketplace by creating the false impression – based on comparisons with artificially inflated bids made possible by 21st Services's falsely understated life expectancy projections – that Coventry is unable to offer competitive bids for policies in the secondary market.

9.     21st Services's false underwriting statements not only have directly injured Coventry, but more broadly threaten cash flows from the capital markets that provide funding for the settlements that so many policyowners find highly beneficial.  Settlement providers purchase life insurance policies using funds raised from either institutional or individual investors.  From the perspective of policyowners, the availability of settlements depends on the continuing flow of

5

capital from investors to the settlement market. But because investors' willingness to commit capital to this sector is contingent on their ability to reap positive returns based on reliable projections of insured life expectancy that determine both the timing and amount of their investment return, 21st Services's false material statements concerning life expectancy will create dramatic disincentives for continued investment in settlements as investors in pools underwritten using 21st Services information suffer large losses. There are thus at least three distinct classes of losers in 21st Services's fraudulent underwriting scheme: Coventry, which has lost millions of dollars worth of insurance policies that it would have acquired but for 21st Services's fraudulent settlement practices; investors, who are duped by 21st Services's life expectancy projections into pouring money into settlement investments that are virtually guaranteed to lose significant sums; and insurance policyowners, whose long-term access to settlements is seriously threatened by 21st Services's misconduct.

10.     Coventry has taken every reasonable measure to avoid litigation over 21st Services's underwriting practices. Coventry has attempted to resolve these concerns by engaging in discussions with 21st Services. Coventry's chief executive officer has personally brought to the attention of 21st Services's management multiple examples of cases in which 21st Services's life expectancy projections deviated obviously and substantially from professional underwriting standards. Coventry executives also personally met in October 2004 with executives of 21st Services to discuss issues arising from 21st Services's false life expectancy projections. Because Coventry's efforts were futile and Coventry continues to face significant, demonstrable financial harm as a result of 21st Services's conduct, and because 21st Services's conduct more broadly threatens the entire market segment in which Coventry operates, Coventry was left with little choice but to seek judicial redress for 21st Services's unlawful conduct.

Specifically, Coventry seeks relief under the Viatical Settlements Act and for tortious interference with prospective contractual relations.

## THE PARTIES

11.     Coventry is a limited liability company formed under the laws of the State of Delaware having its principal place of business in the Commonwealth of Pennsylvania.  The sole member of Coventry is a corporation that is a citizen of Delaware and Pennsylvania, and Coventry therefore is a citizen of Delaware and Pennsylvania.  Coventry is a "viatical settlement provider" within the meaning of the Viatical Settlements Act.  Coventry provides insurance policyowners access to the secondary market for life insurance by purchasing their policies for significantly more than they would receive from other sources.

12.     21st Services is incorporated and has its principal place of business in the State of Minnesota.  21st Services thus is a citizen of Minnesota.  21st Services provides underwriting services to settlement providers.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because Coventry and 21st Services are citizens of different states, and the amount in controversy exceeds $150,000, exclusive of interest and costs.

14.     This Court has personal jurisdiction over the parties because Coventry is located in Pennsylvania, and 21st Services provides underwriting services for settlement contracts relating to policyowners resident in all 50 states, including Pennsylvania.  21st Services has specifically provided underwriting services for settlements entered into by Pennsylvania life insurance policyowners.  In 2003, an executive of 21st Services personally visited Coventry at its principal place of business in Pennsylvania to specifically solicit business from Coventry and

provide underwriting services for Coventry, a Pennsylvania settlement provider.  Moreover, 21st

Services purposely availed itself of business opportunities in Pennsylvania by selling life

expectancy projections to Coventry based on false representations that such projections were

prepared in accordance with professional standards, annually beginning at the latest in 2001 and

continuing until at least August 2004, in exchange for payments by Coventry of hundreds of

thousands of dollars.

      15.     Venue is proper in this district because a substantial part of the events or

omissions giving rise to Coventry's claims occurred within the district.

## BACKGROUND

      16.     The single most important factor determining both the availability of capital from

investors and the price that can be offered to a particular policyowner is the life expectancy of

the insured.  Settlement providers obtain information about the life expectancy of a given insured

from an underwriter.  The underwriter is, in essence, the fulcrum of any settlement transaction,

effectively balancing the interest of investors in accurate projections of life expectancy and the

interest of policyowners in obtaining a price that fairly reflects the financial value of their

insurance policies.

      17.     Legitimate underwriters assess mortality risk (and, therefore, life expectancy)

based on established risk classification principles that differentiate among different classes of

insureds according to sound actuarial principles and reasonably anticipated mortality and

morbidity experience.   The underwriting process is more complicated than simply adding a

column of numbers based on raw data; instead, underwriters are required to exercise sound,

objective, and consistent professional judgment, and to act independently and without bias.

18.     Because both the financial return expectations of investors and the price expectations of policyowners are based on life expectancy projections generated by underwriters, any pattern of understating life expectancy necessarily has a significant negative effect on the individual settlement transactions.  In particular, legitimate settlement providers lose contracts to bids based on falsely understated life expectancy projections.  These false statements also affect the settlement market more broadly.  The willingness of investors to commit capital to fund the purchase of life insurance policies from policyowners is predicated on the assumption that underwriter-generated assessments of life expectancy are legitimate and in accordance with accepted professional standards.  Because the settlement market is a relatively new phenomenon, any underwriter conduct that calls into question that assumption creates a significant risk that investors will flee the market, and that the access to the secondary market currently enjoyed by policyowners will be jeopardized in the long term.

19.     As in many emerging financial markets, the settlement market has been characterized by instances of fraud.  To address these instances of fraud, the National Association of Insurance Commissioners ("NAIC") promulgated the Model Viatical Settlements Act, which was adopted in Pennsylvania in 2002.  The Viatical Settlements Act, found at 40 Pa. Stat. § 626.1 *et seq.*, broadly prohibits "any person" from "knowingly . . . [and] for pecuniary gain . . . presenting, causing to be presented, or preparing with knowledge or belief that it will be presented to . . . a viatical settlement provider, viatical settlement broker, viatical settlement purchaser, financing entity . . . or any other person false material information as part of, in support of or concerning . . . [t]he underwriting of a viatical settlement contract . . . ."  40 Pa. Stat. § 626.2.  The Viatical Settlements Act provides that "[a]ny person damaged by the acts of a person in violation of [the] act may bring a civil action against the person committing the

9

violation in a court of competent jurisdiction." *Id.* § 626.12(b).  Substantially identical language

has been adopted in states including Arkansas, Louisiana, Nebraska, Nevada, North Carolina,

Ohio, and Virginia.

## 21ST SERVICES'S SETTLEMENT UNDERWRITING PRACTICES

20.     The Viatical Settlements Act defines the term "fraudulent viatical settlement act"

to include "an act or omission committed by any person who . . . knowingly . . . [and] for

pecuniary gain . . . presenting, causing to be presented, or preparing with knowledge or belief

that it will be presented to . . . a viatical settlement provider, viatical settlement broker, viatical

settlement purchaser, financing entity . . . or any other person false material information as part

of, in support of or concerning . . . [t]he underwriting of a viatical settlement contract . . . ." 40

Pa. Stat. § 626.2.

21.     Underwriters typically express an individual's mortality risk and life expectancy

as a percentage of the "standard" risk for a person of like sex and age.  This "standard" risk,

generally expressed as "100%" or "base mortality", is derived from mortality tables in one of

several reinsurance manuals that are widely used in the insurance industry.  Deviations from this

standard risk, often referred to as "extra mortality," are also expressed in percentages, and are

based on "debits" applied by an underwriter based on assessment of the mortality risk associated

with identifiable abnormal medical conditions and other considerations.  Thus, for example, a

65-year-old male with no identified abnormal medical conditions that would predictably affect

his survival might be characterized as having 100 percent total mortality.  An 87-year-old female

with a moderately serious medical condition might be characterized as having 200 percent rating.

This means individuals characterized as having 200 percent mortality would be expected to have

twice the mortality rate that the standard individual for that age and sex.  In the more than 1,600

cases examined by Coventry in which 21st Services provided underwriting services, 21st Services found only 3 insureds to be a standard risk, with all others found to be an elevated mortality risk.  Three other nationally recognized underwriting firms found an average of more than 150 standard risks for the same population.

22.     21st Services systematically miscalculates the extra mortality associated with individual debits in individual cases.  In its August 2000 memorandum, Milliman & Robertson found that 21st Services improperly "sum[s] up . . . small debits which would provide an overstatement of mortality."

23.     The National Association of Insurance Commissioners' Model Viatical Settlement Regulation defines the term "life expectancy" to be "the mean of the number of months the individual insured under the life insurance policy to be viaticated can be expected to live as determined by the viatical settlement provider considering medical records and appropriate experiential data."  This definition is accepted as an industry standard in the settlement industry.  Under this definition, for example, when an underwriter following professional standards states that a 65-year-old male with no identified abnormal medical conditions has a life expectancy of 230 months, the underwriter means that 50 percent of persons with a similar background would be expected to die before 230 months while the other 50 percent would die after 230 months.  In calculating a life expectancy, underwriters generate what is comparable to a bell curve (referred to in the industry as a "mortality curve"), representing the insured's life expectancy.  The midpoint of this bell curve would represent the point at which 50 percent of the persons with a similar background would be expected to have died, or the mean life expectancy.

24.     21st Services reports their life expectancies not based on the midpoint of the

mortality curve, but based on the 85th percentile of the mortality curve.  In so doing, 21st

Services conceals the true extent to which its projections differ from those of underwriters that

conform to professional standards.  For example, if 21st Services provided a life expectancy of

230 months at the 85th percentile while another underwriter projected 230 months based on the

mean as it is generally expressed, then 21st Services is projecting that 85 percent of insureds

with similar medical profiles to this 65-year-old male would die within 230 months, while the

other underwriters project that only 50 percent of insureds with this same medical profile would

die within 230 months.    When 21st Services's life expectancies expressed in the average

number of months are compared to other nationally recognized firms which report life

expectancies in the average number of months, 21st Services's life expectancies are significantly

and systematically lower than the other settlement providers.  Indeed, 21st Services typically

projects that the point at which 85 percent of insureds will die on average 21 months earlier than

the point at which other underwriters believe that 50 percent of the same insureds will die.

25.     In applying debits in a particular case, an underwriter acting within the bounds of

accepted professional conduct will apply accepted methodologies to determine both the

applicability and magnitude of debits relating to specific identifiable medical conditions.  The

settlement contracts which Coventry has lost due to 21st Services's fraudulent underwriting

practices involved older-aged insureds.  The methodology underwriters employ in applying

debits is particularly important in underwriting for the elderly because such debits have a greater

impact on life expectancy.  For example, a 50 percent extra mortality rating on a 40-year old

male would reduce life expectancy by approximately 10 percent.  However, that same 50 percent

extra mortality rating in an 85-year old male would reduce life expectancy by approximately 25

percent. Legitimate underwriters appropriately consider this substantial impact of debits when applying their professional judgment to such cases. In fact, in an article entitled "Older-Age Underwriting: It's Distinctly Different, And With Good Reason," published in the July 29, 2004 issue of *National Underwriter*, Hank George – an underwriter frequently consulted and relied upon by 21st Services – specifically recognized the importance of considering differences between older-age insureds and other insureds in making life-expectancy projections.

26.     21st Service's underwriting practices, however, do not comport with accepted professional standards. 21st Services's assessments of mortality risk and life expectancy consistently, systematically, and significantly understate the actual life expectancy of insureds they evaluate.

27.     Coventry has reviewed statistical information relating to more than 1,600 specific instances in which 21st Services presented mortality risk and life expectancy information to settlement providers and in which underwriting information was also available from other sources. In over 97 percent of those cases, 21st Service's life expectancy projection was the shortest among all underwriters providing such projections. The magnitude of this difference was as significant as its consistency: Among the 1,600 plus cases examined, the average life expectancy projection provided by 21st Services was less than 60 months (or over 50 percent) shorter than the average life expectancy projections provided by nationally recognized settlement underwriters that submitted underwriting information.

28.     Not only do 21st Services's life expectancy projections differ significantly from those submitted by underwriters that adhere to professional underwriting standards, but 21st Services affirmatively misrepresents the accuracy of its life expectancy projections. According to 21st Services's Internet site, "87 percent of the senior insureds reviewed by 21st Services have

died on time or earlier than their projected life expectancy." But in fact, an analysis of the 1,600 cases examined shows that actual deaths occur at a rate of only 35 percent of the expected deaths projected by 21st Services.

## 21ST SERVICES'S KNOWING PRESENTATION OF FALSE MATERIAL INFORMATION IN CONNECTION WITH SETTLEMENT CONTRACTS

29.     For at least three independent reasons, 21st Services knew or should have known that the mortality risk assessments and life expectancy projections it provided (and continues to provide) to settlement providers were and are false.  First, executives of 21st Services have directly admitted to Coventry that 21st Services's mortality risk assessments and life expectancy projections are outside the normal range that would be expected in an underwriting process conducted according to professional standards.  Not only did 21st Services know that it was consistently lower than the nationally recognized underwriting firms, but it used that information as a marketing point to attract business.  21st Services in attempting to solicit business from Coventry represented that the life expectancies that 21st Services would provide were shorter than their competition at least 25 percent of the time.  Second, prior to instituting this litigation and in an effort to avoid it, Coventry identified for 21st Services the problems with its underwriting process in connection with numerous specific cases, and 21st Services refused to remedy the situation.  Third, 21st Services's mortality risk assessments are so consistently and significantly outside the bounds of risk assessments provided by other underwriting firms with respect to the same insureds that 21st Services was on inquiry notice that its underwriting practices were generating false results.

30.     21st Services presented false life expectancy information to settlement providers knowing that such settlement providers would present the false information to investors and financing entities in order to present a more attractive investment opportunity.  21st Services's

14

underwriting fees are on a per case basis.  21st Services is driven to continue to provide its

fraudulent underwriting because unscrupulous or ignorant settlement providers acquire more

settlement contracts based on the falsely understated life expectancies.

## COVENTRY'S DIRECT INJURY CAUSED BY 21ST SERVICES'S FRAUDULENT SETTLEMENT ACTS

31.     In numerous instances, settlement providers competing directly with Coventry to

purchase particular insurance policies have relied on 21st Services's false mortality and life

expectancy assessments to obtain capital from investors to purchase such policies at prices that

reflected the false mortality and life expectancy assessment.  21st Services's fraudulent practices

harm Coventry in a number of distinct ways.  First, in many such cases, Coventry offered the

policyowner the second-highest price among all competing settlement providers, and the highest

price among those providers using legitimate underwriting information.  Second, 21st Services's

fraudulent practices have caused reputational injury to Coventry by creating the false impression

that Coventry's bids for settlement contracts are too low, when in fact the bids of competing

settlement providers that use 21st Services are artificially inflated due to 21st Services's falsely

understated life expectancy projections.

32.     For example, Coventry attempted to acquire three policies with face values

totaling $10,000,000 from a resident of Pennsylvania.  In or about April 2004, Coventry placed a

bid on the policies of $1,450,000 based on a mean life expectancy of 127 months.  Two

nationally recognized firms provided mean life expectancy projections of 117 months and 127

months for this insured, but 21st Services's mean life expectancy projection for this case was a

mere 58 months (100 months at the 85th percentile).  The winning bid of $3,475,000 was placed

by a provider generally known to use 21st Services.  The winning bid could not have been

generated based on a life expectancy within the legitimate range. But for this false life expectancy projection generated by 21st Services, Coventry would have acquired the policy.

33.    Another Pennsylvania policyowner accepted competing bids in relation to a life insurance policy with a face value of $500,000. The winning bid of $55,000, which did not include commission, was placed by a provider generally known to use 21st Services's underwriting services. On or about July 30, 2004, Coventry placed its bid of $22,000 (including commissions), based on a mean life expectancy of 91 months. Two nationally recognized underwriters provided mean projections of 96 months and 91 months. Coventry's bid was the second highest bid, and the winning bid could not have been generated based on a life expectancy within the range that a professional underwriting process would have generated. But for this false life expectancy projection generated by 21st Services, Coventry would have acquired the policy.

34.    Coventry attempted to obtain a policy with a face value of $5,000,000 from another resident of Pennsylvania. Based on a life expectancy of 135 months, Coventry placed a bid of $250,000 in or about March 2004. Two nationally recognized firms provided mean life expectancy projections of 135 months and 137 months, but 21st Services's mean projection was less than half these projections at approximately 52 months (90 months at the 85th percentile). A provider generally known to use 21st Services acquired the policy with a bid of $395,000, which would not have been possible if it was based on a life expectancy within the range that a professional underwriting process would have generated. But for this false life expectancy projection generated by 21st Services, Coventry would have acquired the policy.

35.    In January 2004, Coventry attempted to obtain yet another policy from a resident of Pennsylvania. The policy in question had a face value of $1,000,000. Two professional

underwriters provided mean life expectancy projections of 101 and 105 months, respectively.  In this case, even at the 85th percentile, 21st Services's projection was less than half these other projections at 50 months.  Based on the longer of these two projections, Coventry placed the second-highest bid at $92,000.  A provider generally known to use 21st Services acquired the policy with the winning bid of $310,000 – more than 3 times Coventry's bid – which would not have been possible if it was based on a life expectancy within the range that a professional underwriting process would have generated.  But for this false life expectancy projection generated by 21st Services, Coventry would have acquired the policy.

36.     21st Services has interfered with Coventry's prospective contractual relations in other states with laws substantially identical to Pennsylvania's as well.  For example, in or about April 2003, Coventry placed a bid in an effort to secure a settlement contract with a policyowner who was a resident of North Carolina.  The policy had a face value of $1,000,000.  Based on a mean life expectancy projection of 97 months, Coventry submitted the second highest bid at $71,000.  Two nationally recognized underwriters each provided mean projections of 97 months.  One provider, generally known to use 21st Services, submitted a bid of $255,000 based on a life expectancy of 41 months—less than half the projections provided by the other professional underwriters.  It would have been impossible for a provider to place such a bid based on a life expectancy within the range that a professional underwriting process would have generated.  But for this false life expectancy projection generated by 21st Services, Coventry would have acquired the policy.

37.     Coventry attempted to acquire a policy with a face value of $1,000,000 from another resident in North Carolina.  In or about June 2004, Coventry placed the second highest bid of $15,000.  The winning bid of $100,000 was placed by a provider generally known to use

21st Services projections. It would have been impossible for the provider to place the winning bid using a life expectancy within the range that a professional underwriting process would have generated. But for this false life expectancy projection generated by 21st Services, Coventry would have acquired the policy. 21st Services's false underwriting practices affect Coventry in its business operations nationwide because Coventry has been deprived of contractual relations similar to the above examples throughout the country.

38.     Coventry's reputation has also been harmed by 21st Services's false life expectancies. For example, in connection with a settlement contract for which Coventry submitted a bid, a Pennsylvania-licensed life settlement broker indicated that he would no longer offer bidding opportunities to Coventry because Coventry has acquired a reputation in the industry of not bidding as high as those providers that rely on 21st Services life expectancy projections. But for 21st Services's falsely understated life expectancies, Coventry's flow of business opportunities would not have been interrupted in this and other cases by the effect of 21st Services's falsely understated life expectancy projections.

## THERE IS NO LEGITIMATE SOCIAL INTEREST THAT JUSTIFIES 21ST SERVICES'S FRAUDULENT SETTLEMENT PRACTICES

39.     In determining whether interference with prospective contractual relations was improper, the court will consider whether there are any identifiable social interests that would support the defendant's conduct. There is no identifiable social interest that could justify 21st Services's conduct, because 21st Services's falsely understated life expectancy projections systematically and significantly harm investors, potentially robbing them of their entire investment, and further put at risk the entire settlement market and the benefits it creates for policyowners.

40.     Investors provide capital for the acquisition of settlement contracts with the

expectation of a positive rate of return calculated based on life expectancies.  The value of a

settlement contract varies inversely with the insured's life expectancy; the shorter the life

expectancy, the higher the price an investor will pay to acquire a policy covering the insured's

life.  When underwriting information that fraudulently understates an insured's life expectancy is

used to calculate the rate of return, investors risk losing a significant portion, if not all, of their

investment.  If a settlement is based on a false life expectancy, not only do investors suffer

considerable losses because they paid too much for the policy, but they are also at risk of losing

their entire investment (or even an amount exceeding the initial investment amount) because

there is a greater chance that, in order to prevent the policy from lapsing prior to maturity,

premium payments will be required beyond the date on which the investors had expected the

policy to mature.  These losses are not realized until after the policyowner outlives the fraudulent

life expectancy and, therefore, investors are generally unable to identify the fraud until a

considerable time after the initial investment.

41.     For example, most recently, the Securities and Exchange Commission ("SEC")

filed a complaint in a highly publicized case against Mutual Benefits Corporation, a settlement

provider that admits to have used life expectancy projections provided by 21st Services.  The

SEC's complaint alleged, among other things, that the $1.067 billion raised by the settlement

provider from thousands of individual investors was jeopardized because the life expectancies

for 65% of the acquired policies had been fraudulently determined and understated.  (Complaint,

*Securities and Exchange Commission v. Mutual Benefits Corp.*, No. 04-60573 ¶¶ 29, 37-39).

Particularly alarming was the fact that 90 percent of the provider's active policies had surpassed

their assigned life expectancies.  (*Id.* ¶ 40).  Because of the systematic and fraudulent nature of

the provider's activities, the provider's operations were shut down to protect potential investors before they became victims of a fraudulent scheme where they would be guaranteed to lose their investments.  The fundamental nature of the challenged practice – namely, systematic understatement of life expectancies – is identical to the fraudulent underwriting practices that 21st Services systematically and significantly conducts.

42.    Another fraud scheme in Ohio, involved a settlement provider that relied on falsely understated life expectancies.  In that case, investors sued a provider seeking to recoup a portion of the $20,000,000 raised in connection with life settlement contracts.  The provider's founder and seven others had been indicted on fraud and money laundering charges.  Supported by the indictment, the gravamen of the complaint involved the misrepresentation and fabrication of life expectancies the company used in securing the contracts.  (Complaint, *Davis v. Lifetime Capital, Inc.*, No. 3:04cv0059 ¶ 25).  Because the provider needed to promise a rate of return based on a particular life expectancy range, "virtually all life expectancies were artificially represented to be within [that] range."  (*Id*. ¶ 17.)  Similarly, 21st Services's false life expectancies are relied upon by unscrupulous providers in acquiring life insurance policies.

43.    California's Department of Corporations recently highlighted the topic of settlement fraud, warning of "an increase in deceptive marketing practices such as falsifying information about a policyowner's health or guaranteeing investors an inflated rate of return." (News Release, Department of Corporations of the State of California, March 8, 2004.)  The State of California has obtained fraud convictions and have issued subpoenas to companies connected with those deceptive practices.  (*Id*.)  21st Services's conduct contributes to deceptive marketing practices by providing false information about the health of insureds that is relied upon by settlement providers.

44.     On August 12, 2003, the Florida Office of Insurance Regulation issued a notice

stating that it had "become aware that some issuers of life expectancy certifications may be

routinely issuing estimates of life expectancy which are substantially and consistently below

those issued by most or all others issuing certifications.  Such estimates undermine the ability of

a viatical settlement purchaser to properly assess the risks and benefits of purchasing a life

insurance policy or an interest in a life insurance policy."  21st Services's conduct falls within

the scope of conduct warned against in this regulatory notice.

45.     The threat of settlement fraud has also been recognized at the federal level.  In

addressing the Oversight and Investigations Subcommittee of the Financial Services Committee

of the U.S. House of Representatives, Postal Inspector Greg Beriaut advised of the increase in

fraud.  *Retirement Protection: Fighting Fraud in the Sale of Death Before the Oversight and*

*Investigations Subcommittee of the House Financial Services Committee*, 107th Cong. 15-20

(2002) (statement of Greg Beriaut, U.S. Postal Inspector).  Beriaut specifically recognized false

life expectancies as one of the challenges that law enforcement, regulatory agencies and

insurance companies face as they strive to combat and prevent fraud.  *Id*. at 19.  He concluded

that "[l]ife expectancy projections are a key component in determining the pricing and selling of

viaticated policies. ... These projections are seldom questioned, thus making them highly

susceptible to fraud." *Id*. (prepared remarks found in Appendix at 34).  Because life expectancies

are seldom questioned, investors and others can only rely on the professional standards of

underwriters to govern their practices.  21st Services has grossly violated those standards by

providing false life expectancies.

46.     21st Services's underwriting practices are substantially similar to the fraudulent

schemes outlined above in that it systematically and significantly understates the life

expectancies of insureds for the purpose of defrauding investors of their capital in settlement investments. Given the number of high-profile statements by state and federal regulators condemning such practices, 21st Services had actual or constructive knowledge that its underwriting practices were unlawful. A conservative estimate of economic injury caused by 21st Services's fraudulent underwriting practices suggests that approximately $100 million of life insurance policies (measured by policy face amount) is acquired monthly by settlement providers that use 21st Services's falsely understated life expectancy projections.

47.     21st Services's fraudulent action taints the reputation of the settlement market. 21st Services's fraudulent practices jeopardize the vitality of the settlement market because it calls into question the legitimate means of calculating the purchase price of life insurance policies.   As investors lose money as a result of these false life expectancies, they will pull their capital from the settlement market. It will become more difficult to attract capital to the market because of the extensive losses investors have incurred, and continue to incur. If the settlement market implodes, Coventry will not be its only victim. Without the sufficient capital needed by settlement providers, the elderly and others who have similarly benefited from settlements will be stripped of this valuable financial option. The similarities between 21st Services's conduct and the challenged practices outlined above, as well as the possibility of the settlement market's collapse, reveal that 21st Services has no legitimate social interest in continuing such fraudulent practices.

## COUNT I:

### VIOLATIONS OF THE VIATICAL SETTLEMENTS ACT

48.     Coventry incorporates and realleges paragraphs 1 through 46 as though fully set forth herein.

49.     21st Services's conduct as alleged herein constitutes the knowing presentation of false material information for the purpose of pecuniary gain as part of, in support of, or concerning a fact material to the underwriting of a settlement contract, the solicitation, offer, effectuation or sale of a settlement contract or insurance policy, and otherwise violates the Viatical Settlements Act in a manner entitling Coventry to redress.

50.     Coventry has been damaged by the acts of 21st Services in violation of the Viatical Settlements Act.  Specifically, Coventry has been deprived of the economic value (including fees and other valuable rights) it would have received had it obtained policies that it lost to competing settlement providers whose bids and access to investor capital were based on 21st Services's false underwriting assessments.  Coventry has also incurred reputational damages as described more fully above.  Coventry is entitled to recover the full amount of that lost economic value in an amount to be proven at trial, but exceeding $150,000.

### COUNT II:

### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

51.     Coventry incorporates and realleges paragraphs 1 through 49 as though fully set forth herein.

52.     Coventry had a prospective contractual relationship with each policyowner with respect to whom it submitted a bid that was rejected in favor of a bid submitted by a settlement provider that relied on 21st Services's false mortality and life expectancy assessment.

53.     21st Services prepared its false mortality and life expectancy assessments with the purpose and intent of ensuring that its settlement provider customers would, at the expense of Coventry, be able to acquire life insurance policies through settlements.

54.     21st Services lacked a privilege or justification for its conduct as alleged herein. In particular, 21st Services's mortality and life expectancy assessments were knowingly false, were prepared in contravention of accepted underwriting standards, and were presented to settlement providers, investors or financing entities, and policyowners in violation of the Viatical Settlements Act.

55.     21st Services's conduct as alleged herein caused Coventry actual damages in an amount to be proven at trial, but exceeding $150,000.

## COUNT III:

## NEGLIGENCE

56.     Coventry incorporates and realleges paragraphs 1 through 54 as though fully set forth herein.

57.     Coventry purchased life expectancy projections from 21st Services on numerous occasions between at least 2001 and August 2004.  Coventry paid 21st Services at least $435,120.00 for these life expectancy projections.

58.     In generating and selling these life expectancy projections, 21st Services owed a duty to Coventry to comply with accepted professional settlement underwriting standards.

59.     21st Services breached its duty to comply with accepted professional settlement underwriting standards by providing to Coventry life expectancy projections that, in 95 percent of cases, were shorter than other projections received from other underwriters, and were on

average more than 50 percent shorter than comparable projections received from other underwriters.

60.     21st Services's breach of duty in fact and proximately caused Coventry damages in an amount of at least $435,120.00.

## COUNT IV:

## BREACH OF CONTRACT

61.     Coventry incorporates and realleges paragraphs 1 through 60 as though fully set forth herein.

62.     An agreement existed between Coventry and 21st Services whereby Coventry purchased life expectancy projections from 21st Services that were to be prepared in compliance with accepted professional settlement underwriting standards.

63.     21st Services breached their agreement with Coventry by failing to comply with accepted professional settlement underwriting standards in connection with the life expectancy projections purchased by Coventry.

64.     As a result of this breach, Coventry was harmed in an amount of at least $435,120.00.

## COUNT V:

## UNJUST ENRICHMENT

65.     Coventry incorporates and realleges paragraphs 1 through 64 as though fully set forth herein.

66.     Coventry conferred a benefit upon 21st Services when it paid 21st Services at least $435,120.00 for the life expectancy projections Coventry purchased from 21st Services.

67.     21st Services had an appreciation or knowledge of the benefit conferred upon 21st Services when it accepted payment from Coventry for the life expectancy projections Coventry purchased.

68.     It is inequitable for 21st Services to retain the benefit of the payments Coventry made to 21st Services because the life expectancy projections were not based on professional settlement underwriting standards.

## PRAYER FOR RELIEF

69.     WHEREFORE, Coventry prays for entry of a judgment in its favor that provides the following relief:

   a.     Compensatory damages in an amount to be proven at trial;

   b.     Disgorgement of profits wrongfully obtained as a result of the conduct alleged herein;

   c.     Such injunctive relief as the Court deems just and appropriate;

   d.     Punitive damages in an amount the Court deems just and appropriate;

   e.     All costs, expenses and attorney's fees to which Coventry may be entitled;

   f.     Pre-judgment and post-judgment interest; and

   g.     Any and all further relief as may be just and appropriate.

## DEMAND FOR JURY TRIAL

70.   Coventry demands a trial by jury.

Respectfully submitted,

Stephen J. Kastenberg
Jason A. Leckerman
BALLARD SPAHR ANDREWS &
    INGERSOLL, LLP
1735 Market Street
51st Floor
Philadelphia, Pennsylvania  19103
(215) 665-8500
(215) 864-9282 (facsimile)

*Of counsel:*

Brian P. Brooks
Melissa A. Holyoak
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C.  20006
(202) 383-5300
(202) 383-5414 (facsimile)